UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL GEHART,

      Plaintiff,

vs.

VISALUS, INC., a corporation,
NICK SARNICOLA, BLAKE MALLEN,
POWER COUPLE, INC., and
ARRIVEBY25, INC.,

      Defendants.

_____/

Case No.
Hon.

**COMPLAINT
AND JURY DEMAND**

SOMMERS SCHWARTZ, P.C.
Andrew Kochanowski (P55117)
Sarah L. Rickard (P78767)
Attorneys for Plaintiff
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
akochanowski@sommerspc.com
srickard@sommerspc.com

WEXLER WALLACE LLP
Edward A. Wallace
(IL Reg. No. 6230475)
Mark R. Miller
(IL Reg. No. 6283542)
Adam Prom
(IL Reg. No. 6317283)
Attorneys for Plaintiff
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 589-6272
EAW@wexlerwallace.com
MRM@wexlerwallace.com
ap@wexlerwallace.com

PREBEG, FAUCETT & ABBOTT,
PLLC
Matthew J.M. Prebeg
(TX Bar No: 00791465)
Brent T. Caldwell
(TX Bar No: 24056971)
Attorneys for Plaintiff
8441 Gulf Freeway, Suite 307
Houston, TX 77017
(832) 743-9260
mprebeg@pfalawfirm.com
bcaldwell@pfalawfirm.com
_____/

## INTRODUCTION

1.     ViSalus claims to be a "healthy lifestyle" multi-level marketing company, which sells its meal replacement shakes, snacks, and vitamin supplements through a network of independent distributors.  Plaintiff was one of those distributors. When he joined, Plaintiff did not know that ViSalus operated an illegal pyramid scheme.

2.     When Plaintiff became a distributor he was told that he could purchase ViSalus product at a so-called "wholesale" price for an opportunity to re-sell to others at a "retail" price. That turned out not to be true. Plaintiff built a "downline" of distributors who could find few real customers, but instead ended up purchasing product themselves. What Plaintiff found out is that ViSalus provides little opportunity for a distributor to actually earn any sort of income off of product sales alone. Worse, ViSalus prevented distributors from actually effectively selling the product they were required to buy, by, among other things requiring the distributors to not sell the product they need to buy except at a high mark-up.

3.     Nonetheless, ViSalus wanted to move product some way. In late 2011, Plaintiff made an agreement with the top management at ViSalus to sell its product through the Internet seller Amazon. While management and the top promoter,

1

Defendant Nick Sarnicola, were telling other distributors about the company's non-involvement and discouragement of anyone selling through an Amazon storefront, Defendants supplied Plaintiff with millions of dollars worth of product, often calling him and asking if he would buy more, so he could sell it at wholesale rather than retail pricing and outside the multi-level marketing channel that ViSalus insisted its distributors must use.

4.     For years with top management's encouragement, Plaintiff purchased large quantities of ViSalus product at below-wholesale price and re-sold it on Amazon at a wholesale price, a practice that effectively made ViSalus products available throughout the United States at distributor prices to everyone. The program was so successful that after Plaintiff established his storefront, ViSalus installed several other distributors with the same arrangement to sell on Amazon, all while telling its other distributors that selling on Amazon was not encouraged and hiding its involvement with the practice from its several hundred thousand distributors. The sales of these Amazon distributors were significant, estimated at $4 million per month. The sales had another side benefit to ViSalus. The Amazon distributors generated reams of "customers" who were assigned to people within the multi-level marketing system whose "sales" could be claimed to be as a result of the multi-level operation. Those sales generated commission profits to Nick

2

Sarnicola and others even though they were the result of straight retailing outside the system. And ViSalus gained several hundred thousand "customer" entries in its sales records to claim to participants and others that the ViSalus product can be profitably sold by distributors who pay for the right to distribute.

5.     In early January, 2017, Defendants decided to take over the Amazon business for themselves, that Plaintiff had carefully built, and cut out Plaintiff and the other distributors who had established Amazon stores. It lodged a bogus trademark complaint with Amazon, claiming that the sale of ViSalus product by its own distributors constitutes trademark infringement. It made an agreement with a captive distributor to sell the product on Amazon on its behalf, and effectively shut down Plaintiff's Amazon store. Plaintiff has become yet another victim of the scheme that has been operated by the Defendants and others for years.

## **THE PARTIES**

6.     Plaintiff, Michael Gehart ("Gehart") is an individual residing in Scottsdale, Arizona. In February 2010, Gehart became a ViSalus distributor after being recruited by an original owner of ViSalus's predecessor.

3

7.     Defendant, ViSalus, Inc. ("ViSalus") is a Nevada corporation headquartered in Troy, Michigan. ViSalus has at all times relevant to this complaint operated as a purported seller of health and weight loss products through a multi-level marketing ("MLM") distribution system. Although it purported to operate a legitimate MLM system, in reality, as set forth in the Third Amended Complaint of *Kerrigan et al. v. ViSalus, Inc., et al.*, Case No. 2:14-cv-12693, United States District Court for the Eastern District of Michigan, ViSalus and all defendants named here and others operated a pyramid scheme masking as a wholesale distribution business. The allegations contained in Paragraphs 45-113 in the Third Amended Complaint which set forth the scheme and the relationship between ViSalus, its management, shareholders and other related persons and entities are incorporated herein.

8.     All of the events described in this Complaint occurred between 2010 and the present.

9.     Defendant Nick Sarnicola ("Sarnicola") is an individual residing in Florida. From approximately 2006 until 2010 Sarnicola acted as an executive and employee of ViSalus (and a predecessor company).  Between 2010 and 2016, he was ViSalus's top and primary promoter of the ViSalus pyramid scheme. As such,

4

Sarnicola sat atop several massive "downlines" of distributors and customers and received commissions and bonuses in a variety of ways as a result of transactions attributed to the downlines.

10.     Defendant Power Couple, Inc., ("Power Couple") is a Delaware corporation owned by Sarnicola together with his wife Ashley Sarnicola. Defendant ArriveBy25, Inc., ("AB25") is a Delaware corporation owned by Sarnicola. Sarnicola participated in the pyramid scheme and the scheme set forth in this complaint, both individually and through Power Couple and AB25. For example, both AB25 and Power Couple received commissions from the operation of the "downline." Both companies entered into various agreements and paid promoters in the scheme outside of the ViSalus compensation system, including contracts with the Plaintiff as described below.

11.     Defendant Blake Mallen ("Mallen") is an individual residing alternately in California and Michigan, and employed in an executive capacity by ViSalus.  Along with Sarnicola, Mallen holds himself out as a "co-founder" of ViSalus and is a shareholder of the company. Since approximately 2013, Mallen assumed the day-to-day operations of ViSalus.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, in that this action is brought under 18 U.S.S. Sec. 1961 et seq.,  and 1332(a), in that Plaintiff and all Defendants are residents of different states. This Court has personal jurisdiction over each defendant. The Defendants continuously and systematically engaged and continue to engage in business in Michigan. In accordance with 18 U.S.C. § 1965(a) and (b), all of the Defendants are subject to this Court's jurisdiction in that they "transact affairs" in the Eastern District of Michigan.


13.     ViSalus operates in Troy, Michigan.  Venue is proper in this Court over all Defendants pursuant to 28 U.S.C. §1391.

## BACKGROUND FACTS

14.     Since at least 2008 ViSalus has held itself out as a multi-level marketing company that only sells its products through a network of distributors. In print and Internet advertising, and widely disseminated by itself and many other paid promoters, ViSalus touted that its line of health-related products could only be purchased through personal sale by an authorized ViSalus distributor. It signed up tens and later hundreds of thousands of distributors to sell its products, primarily shakes pitched to promote weight-loss. The written materials given to each

6

distributor appear to prohibit the sale of ViSalus product "in public retail establishments, including but not limited to health food stores, drug stores, pharmacies, grocery stores … or any other similar establishments in which the primary function is the retail sale of products rather than professional services."

15. Plaintiff Gehart enrolled as a ViSalus distributor in February 2010. He did so with no prior MLM experience after being initially recruited by Vito Torriciano, a part-owner of the company, meeting with Sarnicola, and with a few other ViSalus distributors. At the time Gehart lived in Michigan. He purchased a promotional $499 "Executive Success Kit," and began to recruit individuals and try to sell product as advised by Sarnicola.

16. Gehart was placed in Sarnicola's "downline" under ViSalus distributor Matt Ward.  The placement meant that Sarnicola, who obtained his commissions through Defendants Power Couple and AB25, would earn commissions and bonuses from the sales and recruiting activity performed by Gehart (and many others).

17. In the United States marketplace, the ViSalus products, a line of weight-loss shakes, as well as its vitamins and Neon-brand energy drinks, compete

with numerous generic products offered by a variety of manufacturers and sold in retail establishments like CVS, Walgreens, GNC, grocery stores, and through retail virtual "storefronts" on Amazon. They also compete with numerous similar products sold by MLM companies through their distributors by word of mouth.

18.     From the outset Sarnicola went around the Compensation System to encourage Gehart to recruit rather than sell product. Through AB25, Sarnicola provided Gehart with a Commission Advance Agreement and paid Gehart a $2,500 monthly advance to build his business. Through AB25 and Power Couple, Sarnicola reimbursed Gehart for his travel expenses and marketing materials.  After four months of building his ViSalus business under the direction of Sarnicola, Gehart was earning roughly $2,000 a month from the Compensation System commissions and bonuses (which were based on various enrollment and sales activity transactions of Gehart's own "downline") in addition to the under-the-table payments for recruiting from Sarnicola. At other times Sarnicola, through AB25, and other upline distributors paid "rebates" for the sale of an Executive Systems Kit ("ESS") of up to $200.

19.     After he began as a distributor, Plaintiff learned that a number of other distributors were being paid recruiting bonuses by Sarnicola outside the

8

Compensation System. As an example, six months after joining, Sarnicola had a contest to move people at the end of the month. He also learned that Sarnicola and other ViSalus operatives would move whole teams of recruited downlines from one distributor to another in order to reward certain distributors and "punish" others. The effect of such movement was to artificially increase or take away commissions and bonuses from one distributor to another, or to increase Sarnicola's own commissions.

20.    One of the principal means of persuading people to become distributors in its business opportunity presentation, and one of the representations made to the Plaintiff as he signed up and began working the distribution business, is that a distributor (called an "Independent Promoter" or "IP") will receive his or her ViSalus product at "wholesale" or "preferred" pricing of up to 20% less than the so-called "retail" pricing. That representation is made to every distributor in written materials including, among other places, in price lists appended to the distributor application that show the wholesale (sometimes called "preferred") and "retail" pricing available to promoters. After joining, ViSalus, through a network of paid promoters, touts the attractive nature of its product and the pricing it makes available to distributors who want to re-sell the product. Once someone becomes a

distributor, the price for each item he or she purchases is reflected in a website that is assigned to the distributor.

21.     In its written materials ViSalus claims that one of the benefits of being an IP with ViSalus is the ability to purchase products at a wholesale price, "providing [the IP] with an incredible opportunity to receive discounts on personal consumption and earn additional income if [the IP] decides to sell retail products at the Suggested Retail Price."

22.     At all times relevant, ViSalus purported to impose retail price obligations on re-sale by its distributors. Emphasizing that the wholesale, "preferred" priced product must be marked up for re-sale, and explaining why this is so, written materials made a part of every distributor application warn:

> If product prices are dropped below retail value, online market and auction websites can have a negative impact on the relationship that Promoters develop with their Customers.

23.     Written policies made part of the application form inform the new distributor that he or she is strictly prohibited from selling on online sites, such as eBay or Amazon, unless the products are sold at or above the "Retail Price" *and* applicable shipping and handling fees are charged. Written materials warn that the "Suggested Retail Price is the price that *must be used*" (emphasis added) if the

10

product is sold on an online auction site, with "standard shipping and handling rates" applied.

24.     When he joined the system Plaintiff believed that there was a market for the products and real customers, those not connected to the company by having a purchasing requirement to obtain commissions, existed in large enough numbers to justify the money spent on establishing the distribution business. This belief was fostered in Plaintiff and many others who were induced to come hear a business opportunity pitch. For example, Plaintiff heard Sarnicola claim that 70% of the people who had an interest in the product would become customers. Likewise, in its written materials ViSalus emphasized the profit-making possibility of the wholesale/retail pricing difference. For example, its distributor documentation claimed that "retailing" is the "backbone" of any distributor's business. The distributor application even says that, "I agree that as a ViSalus Promoter, I shall place primary emphasis upon the sale of Products and Services to non-Promoter consumers as a condition of my receipt of commissions."

25.     Plaintiff was told, and initially believed, that ViSalus distributors are paid commissions and bonuses only through ViSalus's Compensation Plan. Although the plan is opaque, under its terms ViSalus distributors who remain

11

"active" (that is who purchase product at "preferred" pricing monthly or meet other sales conditions) get the chance to earn commissions and bonuses generally based on the number of ViSalus distributors and customers they are able to recruit into their organization. What Plaintiff did not know until he was in the system was that customers were few, and the real payments could only come from recruiting others into the system.

26.     What Plaintiff also did not know was that the retail price maintenance requirement was made to lend an air of credibility to a pyramid scheme in which distributors were paid for recruiting other distributors. Plaintiff was at all times unaware how the payment structure actually operated, nor was he aware how much in bonuses and for what types of activities bonuses were paid.

27.     The retail price selling obligation, together with the other language in written materials and claims orally made, was designed by Defendants to make it appear that ViSalus distributors like Plaintiff can and actually sell the product at retail pricing to third-party custom sufficient quantities to generate commissions that would enable a profit.

28.     Another purpose of the statements, and the apparent prohibition for online sales except under uncompetitive price terms was to make the distributors believe that ViSalus will not compete with them for "real" customers, nor that ViSalus will not undercut their non-retail sales channel—the only channel effectively made available to the distributor-- with cheaper product that legitimate customers may want.

29.     A third purpose of these statements, and the payment scheme under the Compensation Plan, was to drive the distributors towards the only sort of economic activity that justified their investment of time and money—recruiting other distributors into the system. Defendants knew what Plaintiff and other distributors did not, that much of the sales of the product went to the distributors themselves, that distributors typically purchased considerably more product than customers did and for longer periods of time, and that a distributor generated considerably more profit to Defendants than a customer.

30.     At all relevant times ViSalus made it known that its compliance department, headed by Elaine Le Gall, monitored eBay and Amazon listings for ViSalus product, and if a distributor was identified as selling a ViSalus product under retail price he or she would be sent an email or otherwise contacted, warned

13

and then terminated. The purpose of this was to ensure that distributors did not use those channels to sell product to third parties at wholesale prices.

## THE SCHEME

### a.    Lack Of Real Customers

31.    In 2009 and 2010 Defendants knew that ViSalus was short of customers and that the representations they were making to new distributors about the potential for retail sales were lies. By at least 2011, Mallen and Sarnicola had a financial motivation to increase ViSalus's apparent product sales to be able to launch an IPO in late 2012, resulting in large hoped-for personal gain for Mallen and Sarnicola. And each of them hoped to pump up the numbers to trigger large payments for their stock from Blyth, Inc., a third-party who had entered into a stock purchase agreement with them and their third co-shareholder, Ryan Blair, dependent on earnings. Plaintiff was unaware of any of these motivations.

32.    Sarnicola, Mallen and ViSalus knew the precise financial condition of the company at all times, and knew how many distributors and how many customers were actually in the system. They had precise knowledge from these records, which were disseminated internally and of course made available to Mallen and Sarnicola,

14

of how few actual third-party sales were being made, and thus of the falsity of the representations they continued to make to new distributors. This is because ViSalus maintained a master database of records of every transaction between a distributor and a customer, which was run by a third-party vendor called Exigo. Unknown to Plaintiff at the time, ViSalus, Sarnicola and Mallen each sought to use the database records to paint a false picture of how many customers there actually were.

33.    By November, 2011, although Plaintiff built a "downline" of other distributors sufficient to have him achieve the "rank" of Ambassador, he saw that there were little third-party sales in the system to customers. Gehart's own downline, which extended to many states, had difficulty selling product to more than one or two customers, often a relative or friend of the newly-recruited distributor. Many distributors had no customers at all, especially once a number of distributors had been recruited in the same area.

34.    This jibed with the information that ViSalus, Sarnicola, and Mallen (and other management insiders) knew even before Gehart joined. Each of the new distributors who paid for the right to distribute was averaging less than two customers as listed in the database, and those customers typically bought a far lesser amount of product than the distributor did. This made the transactions appear even

15

more a pyramid scheme. Unknown to Plaintiff at the time, information concerning the lack of customers was disseminated throughout the upper management of ViSalus, typically through board meetings.

35.     This was compounded by the fact that by 2011 ViSalus had flooded the United States market with distributors, so much so that by late 2011, Plaintiff and his "downline" found it difficult to recruit additional promoters.  Nevertheless, certain distributors in the system not in Plaintiff's "downline," were reporting making millions of dollars and were paraded before potential new distributors at conventions and meetings as successful ViSalus distributors.

      **b.**     **Plaintiff Obtains Approval To Sell On Amazon**

36.     Plaintiff believed that there was a demand for ViSalus product but not at the artificial "retail" price and not during the high-pressure networking events that ViSalus insisted on distributors making. He sought to actually make money from distribution without recruiting people into the system. He wanted to retail the products on online retailer Amazon, which by then had developed a sophisticated ability to stock and ship professional sellers' inventory.

37.    In late 2011, he first texted and later talked to Sarnicola about selling ViSalus products through Amazon. Sarnicola agreed and encouraged Gehart to sell ViSalus product to customers on Amazon. As a result, in early 2012, at first with Sarnicola's knowledge and approval, and later with the approval of Mallen and other of ViSalus top management, Gehart began selling ViSalus products through his son's Amazon account store, Living Healthy. This began a five year sales channel of millions of dollars of inventory.

38.    The Amazon program was done under the radar. The storefront never identified Gehart as the seller or that he had an affiliation with ViSalus. This was encouraged by the Defendants, who wanted Gehart not to publicize the new channel to other distributors, as, ostensibly, the MLM word-of-mouth and personal pressure sales were effective. One of the reasons why Defendants "allowed" this channel, as Mallen explained to Gehart through a subordinate, was that it provided a good place for ViSalus to dump excess inventory.

### c.    ViSalus Facilitates Plaintiff Making Massive Sales At Wholesale Prices

39.    Between 2012 and approximately April, 2017, when an Amazon customer anywhere in the United States or Canada purchased ViSalus shakes or

17

other product through Plaintiff's online retail store, Plaintiff would fulfill the order at wholesale or lower prices. ViSalus would facilitate these wholesale sales hiding behind Gehart's storefront, and credit itself with records of reams of fake customers. The Defendants knew that Gehart was selling the product at wholesale, and sometimes less than wholesale prices.

40.    Over a period of years, between 2012 and early 2017, Defendants knowingly, deliberately, and actively, worked with Plaintiff to have the sales channel operate. Thus, while the policies it announced applied to every distributor prohibited buying in bulk, or using multiple accounts, Defendants assisted Plaintiff in circumventing these rules on a weekly basis.

41.    Defendants knew that, unlike virtually anyone else, Plaintiff routinely ordered large amounts of inventory. He initially purchased about $10,000 of ViSalus product a month and grew his Amazon business to an average of $100,000 a month. These orders amounted to 500-600 bags and sometimes as many as 1000 bags weekly. These high volume orders were all purchased with his personal credit card and tied to Gehart's email, address, and account information. Once the product was purchased, with Defendants' actual knowledge, Plaintiff used the promoter ID numbers for his wife, his son, and several other distributors to maximize the

promotion and commissions that accrued as a result of his bulk orders. Ultimately, with Defendants' knowledge and cooperation, he operated nine separate accounts. Plaintiff set up a Saia freight line account to pick up the bulk orders from the ViSalus warehouse and move them to a rented garage space, where the product was relabeled with Amazon stickers and then shipped to Amazon's fulfillment centers.

42. Defendants knowingly and deliberately sold product to Gehart at under "wholesale" price. This was largely done by Defendants working the so-called "Three For Free" program to give Gehart free Challenge kit product for resale on Amazon. As a result, Gehart's per/item cost to buy the product was approximately 54% of the official "wholesale" or "preferred" pricing.

43. With Defendants' knowledge and cooperation, when Plaintiff needed to re-stock the Amazon fulfillment store with physical product, he would order new bulk product and create a fictional "customer" in the computer system to "account for" a qualifying "Three for Free" purchase. The system would record the transaction as a customer purchasing enough product to trigger a free product giveaway, when in reality, ViSalus would ship the "free" product to Gehart for his eventual resale. Plaintiff would then add a customer name into one of the legs of his ViSalus downline depending on where it would generate the most advantageous

19

commission. This accomplished both the goal of creating new "customers" and generating more commissions to those "upline" from the accounts, including Sarnicola.

44.   Gehart called these his "Avatar" customers. Defendants had actual knowledge that these were not records of actual customer transactions because the Avatar customers would each be tied to Gehart's email, address, and credit card. The real customer who ordered a shake or vitamin and paid the wholesale price via Amazon had no affiliation with ViSalus directly and the "Avatar" who was in the Exigo database was not the same transaction as the Amazon purchase.  Ultimately, after the transaction was recorded, the Amazon customer's order was shipped to Gehart where he would repackage the product in an Amazon box and send it to his Amazon customer.

45.   Once the new side-door business was set up, Gehart ceased developing the "traditional" promoting business he had begun in 2010, and invested in the Amazon sales infrastructure. As a result, he gave up substantial sums of money he could have made as a distributor who built out his downline. He built up a base of many thousands of customers and obtained great feedback ratings, which gave his Amazon store a competitive advantage.

46.     Between 2012 and late 2016 or early 2017, specific emails, text messages through the Vi website, and telephone communications were exchanged concerning this arrangement. In addition to communications between Sarnicola and Gehart, Plaintiff repeatedly talked, texted and emailed with (1) Justin Call, an operative who reported directly to Mallen, (2) talked and emailed Eileen Le Gall, the head of the so-called Compliance department, Mallen, and others. Specific examples of telephone and email follow.

47.     In April, 2012, Gehart communicated by email with Call to let him know he had "official" approval to purchase bulk orders of product in excess of the $4999.00 monthly "limit" permitted by ViSalus. By email, Call agreed to accept the orders even though they exceeded the nominal "inventory loading" limit. Once the system was in place, over the years, Call repeatedly called Gehart to ask him to buy thousands of dollars of orders to get ViSalus over some month-end sales numbers since 2012. Call knew that Gehart was buying on multiple accounts with the same credit card and shipped him thousands of orders for ostensibly unique customers to a single address—a warehouse. Each of these conversations, and various confirming emails, were made using wire.

21

48.    In May, 2012, Gehart explained his internet business to both Call and

Le Gall, the ostensible head of "Compliance" of ViSalus. In an email exchange

between them he said:

> [D]istributors [XXXXXX and XXXXXXX] Gehart's market on the
> Internet under the name "Healthy Living!" also social media outlets are
> used to gain business.
>
> the product is shipped direct from ViSalus for 50% of the orders and
> the other orders are shipped to California [Amazon]. they [sic] are
> opened and checked for quality. then [sic] the orders are reshipped
> within 24 hours.
>
> these distributors are using the same model as previously approved with
> others in my team.

49.    A few months after the system was put in place, in August, 2012,

ViSalus amended its "Three for Free" program and put an ostensible limit on the

number of free Challenge kits that could be shipped to one address. Before the

policy change took place, Call notified Gehart to tell him he knew it would affect

Gehart's internet business structure. On that occasion Call and Gehart talked on the

telephone to implement a work-around to the policy change to allow Gehart to pick-

up his high volume orders from the ViSalus warehouse.

50.    In September, 2012, Gehart provided Le Gall by email a list of 267

Avatar customers in the ViSalus database that were scheduled to receive a free

product kit the following month. In response to Gehart's email for help with the

accounts so he would not be charged for the kits, Le Gall admitted knowledge about

Gehart's multiple accounts and offered to facilitate getting the product to Gehart:

> Presumably you have your card on a lot of accounts.  If you can provide the full card number then we can probably cancel them out that way for the next autoship date. Otherwise, it will now be a situation where we have to go into the accounts to rectify the three for free error.
>
> I am sorry for this but we will get it resolved.  Please get the information to me.

51.     Mallen also talked to Call, and Call reported these conversations to

Gehart, about the program. According to Call, Mallen routinely approved Call's

requests for the discounted pricing and high volume orders sold to Gehart and

regularly requested Gehart's monthly goals from Call. When ViSalus needed to

raise their sales numbers, Mallen would have Call telephone Gehart and request that

he purchase an additional high volume order of product. These telephone

conversations occurred frequently over the course of five years.

52.     Gehart also regularly communicated by email and telephone with Call

and Le Gall to work around the ViSalus system notices flagging his account. These

calls and emails occurred between 2012 and 2016.   Gehart also regularly

communicated by telephone and email with Michele Hall in ViSalus's Account

Support Team to use the "Three for Free" program to earn free product, and his

Ambassador Liaison (a ViSalus employee who assists Ambassador ranked

23

distributors with their business), Tanishia Lyons, to create the bulk orders and Avatar customer placements in his downline organization.  These conversations spanned 2012 to 2016.

53.    Each time he updated the "customer" database, which occurred weekly over five years, ViSalus would receive a report electronically. In this fashion, Sarnicola, Mallen, and other ViSalus management knew how many "customers" Plaintiff seeded in the "downline" of the various accounts.

54.    Gehart's "customers" on the computer customer list do not represent real transactions made by distributors in the MLM system: they represent sales made by a retail channel at wholesale prices to strangers. The names as entered do not necessarily match the names of actual customers, the amounts and addresses do not match the names, and the amounts listed do not match the amounts paid. All of this is known and has been known to Sarnicola, Mallen, Call, LeGall and others since the program was set up in 2012.

55.    Plaintiff's wholesale Amazon sales contributed at least $1 million per month in sales and generated hundreds of customer names each week that ViSalus could add to its customer list. It served Defendants' purpose to have this

fictionalized record of customers, and so they encouraged Gehart to continue and expand the business.

### d.    Mallen and Sarnicola Set Up Several Additional Distributors To Sell Silently On Amazon

56.    Because the business did so well, Mallen and Sarnicola later set up several *other* distributors to do the same thing as Plaintiff was doing. A major Amazon distributor in Texas selling under the same circumstances is referred to as "Mr. Big." Upon information and belief, there were similar Amazon distributors operating from New York, Colorado and North Carolina. These operations began in 2013 and to Plaintiff's knowledge were all operating as of early 2017. Plaintiff believes that there were up to six such distributors operating storefronts on Amazon and that each was told by Defendants to keep their operation quiet. Plaintiff estimates that the Amazon sales amounted to more than $4 million a month in total.

57.    The numbers of customers that bought on Amazon but were reported as buying through the MLM channel are very large and dwarf the "real" MLM-channel customers.  By comparison, during the course of his ViSalus business, Gehart had only 20 real customers personally enrolled in his "downline," and only between 5,000 and 10,000 real customers in his entire 6,000+ distributor "downline" organization. In contrast, he added approximately 100,000 Avatar

customers into the database. He estimates that the other businesses set up by Defendants created 400,000 or many more customer entries.

58.     Because the business was ostensibly prohibited as a means of "protecting" its distributors from having customers be able to buy at wholesale prices, the Defendants largely shrouded the identity of the others they authorized to sell wholesale in secrecy, even from Gehart.

59.     The addition of these other distributors actually lowered the price that legitimate customers who wanted a ViSalus shake or vitamin bottle could obtain it for. An Amazon user who seeks a particular product is offered a price set by a computer algorithm authorized by the storefront. If competing sellers offer the same product, the software used by Gehart and his competitors would adjust the price downward automatically to a pre-set level, often resulting in offers to the buyer of under wholesale pricing. Between 2012 and 2017, every U.S. and Canada distributor of ViSalus products could be undersold for the product by Gehart or the other side-door users not only by the 20% or so difference between the "wholesale" and "retail" but even for wholesale prices.

### e. In 2015 Defendants Give Plaintiff Even Better Terms To Sell On Amazon

60.     As the side business was flourishing, ViSalus promoted Gehart as one of its top earning distributors and one of its distributors with the most customers.

61.     In 2013 and 2014, Sarnicola asked Gehart and his wife to assist ViSalus with its expansion into Germany.  Gehart spent several months in Germany promoting ViSalus.  Sarnicola, through ArriveBy25 and Power Couple, agreed to provide Gehart with a "top up" agreement, paying him a $10,000 bonus and reimbursement for his air, hotel, and other travel expenses.  He did not pay Gehart the bonus or parts of the expenses as promised.

62.     Nonetheless, in 2015, Gehart returned to the United States and resumed the full time business selling ViSalus product on Amazon. He reasonably believed that Defendants would continue to support the mutually-beneficial business he had created. Indeed, after he returned from Germany, ViSalus asked Gehart to revise his business structure to accommodate the high volume of Amazon sales he was generating – instead of Gehart placing the monthly high volume orders through the distributors and Avatar customers within his downline organization,

Gehart would place his orders directly to all or his Ambassador Liaison, Michelle

Kassarjian, via the telephone or email. He did so.

63.    In exchange for placing high volume orders of $10,000 or more,

ViSalus agreed to give Gehart a discount on the products and earn 50% Bonus

Volume in the Compensation Plan on the purchased product.

64.    In 2016, ViSalus told Gehart in writing (believed by Plaintiff to have

been authored by Mallen) to sell ViSalus products on Amazon 15% *lower* than the

wholesale pricing:

> As a concession and an understanding of your business model, we
> kindly as you to raise prices to a level that we believe is fair to you.
> The MAP (minimum advertised price) is listed below. This will ensure
> our overall success to come. Your endeavors will be much more
> profitable individually due to high demand for our product and we
> know our promoters in the field will be more satisfied.  If you wish, you
> may set prices HIGHER than these levels.  These prices were obtained
> by taking the cost of the product on VI website with a 15% discount,
> your cost.
>
> 1 Bag of Shake - $42.49 ($49.99 – 15%)
> 2 Bags of Shake - $84.98 ($99.98 – 15%)
> 3 Bags of Shake - $127.47 ($149.97 – 15%)
> 4 Bags of Shake - $169.96 ($199.96 – 15%) Vi Slim & Vi Trim - $37.39
> ($43.99 – 15%) Vi Pak - $107.09 ($125.99 – 15%)
> Neuro - $22.09 ($25.99 – 15%) Superfood Shake – ($89.99 – 15%)
>
> Please be patient while your fellow promoters receive this message and
> adjust their pricing. We will be checking on a daily basis moving

forward to ensure that these pricing levels are met. We will also be keeping track of the sellers that do not adhere to this policy.

Sincerely,

Vi Compliance Team

> ### f.   Defendants Decide To Take Over The Amazon Business Themselves And Cut Out Plaintiff And Other Amazon Distributors

65.   After years of encouraging Plaintiff to buy millions of dollars worth of product, and obtaining benefits from Plaintiff, in early 2017, Defendants decided to get into the Amazon sales business themselves: Sarnicola has directed Plaintiff and the other Amazon distributors to cease selling on Amazon.

66.   Last month, in a strategy meeting with the company's top producers, Sarnicola boasted that Mallen and he figured out how eliminate Plaintiff and everyone else from selling on Amazon. He bragged about a hot-shot lawyer who figured out how to have Amazon freeze and take down the storefront accounts. He admitted to partnering with only one existing distributor as the sole seller of ViSalus product on Amazon.

67.   As Sarnicola boasted, Plaintiff's business has been shut down. A complaint was filed with Amazon by the lawyer at Sarnicola's direction that

Plaintiff was violating ViSalus's "trademark" rights by posting his inventory—the same posting made with Sarnicola's and other Defendants' approval for years-- for sale.

68.   At the same time in April, 2017, Defendants sought to actively freeze out and harm Plaintiff. ViSalus unilaterally removed a substantial number of "points" which can be used as a means for obtaining product (points were earned instead of a dollar commission under one program).

69.   Gehart has received an email from Amazon stating that his product listings for ViSalus products were removed due to "trademark infringement" allegations by the trademark owner, ViSalus, and all of his product would be returned from Amazon's fulfillment center.  ViSalus has ceased paying Gehart's commissions.

70.   ViSalus has directed Amazon to remove all other sellers based upon alleged trademark infringement violations.

71.   At the time his Amazon account was removed, Gehart was earning a profit of $10,000-$15,000 per month on the sales of ViSalus product through his

Amazon account. Gehart has earned approximately $365,000 in profit from his Amazon sales and an additional $1,579,942 through the ViSalus compensation system on commissions from his Amazon sales.

72.    At all times relevant to this Complaint, Gehart was unaware that defendants were operating an illegal pyramid scheme.  Gehart relied upon defendants' express or implicit representations that they had the authority to approve the ViSalus product buying and selling methods described herein on behalf of ViSalus, that ViSalus approved and endorsed Gehart's actions, and that those actions were appropriate and proper with respect to the contractual relationship Gehart had with ViSalus.

## COUNTS

### COUNT ONE
### BREACH OF CONTRACT/PROMISSORY ESTOPPEL

73.    Plaintiff incorporates the facts and allegations contained in the previous paragraphs as if fully restated herein.

74.    ViSalus, Sarnicola and Mallen reached an enforceable agreement with Gehart under which Gehart would purchase high volume orders of ViSalus product in exchange for receiving a discount on the product and the ability to re-sell the product on Amazon at a discounted rate. ViSalus agreed to pay Gehart for the

purchases under the Compensation Plan.  The agreement was made at least as of April, 2012, and was documented in a series of emails and pattern and practice between the parties. The agreement had no termination provision.

75.     Gehart performed under the agreement. ViSalus ratified the agreement each week between 2012 and January, 2017, when it assisted Gehart with ordering ViSalus product in excess of the amount permitted to typical distributors by: (1) approving the high volume orders and product discounts to Gehart; (2) approving and permitting Gehart to use the Three for Free program to earn additional product through his Avatar customers; (3) arranging the shipping or pick-up for the high volume product orders; and/or (4) placing the high volume orders through Gehart's Avatar customers in his downline organization.

76.     In the alternative, ViSalus is estopped from refusing to allow Plaintiff to sell on Amazon because it knew that Plaintiff relied on its actions and invested substantial time and effort in creating the business for his and ViSalus's benefit.

77.     In reliance on the existence of the agreement, and the actual promises of its continuation so long as ViSalus was in business, Gehart gave up a lucrative distributor business and the opportunity to make substantially more money than the Amazon business was generating. He invested in the Amazon business and spent

substantial, uncompensated time setting up the German business for Defendants in further reliance on the business relationship.

78.     ViSalus, Sarnicola, and Mallen have now breached their agreement with Gehart by blocking his product sales on Amazon and by requesting Amazon remove his store as an "unauthorized" seller. The breach is deliberate, as these Defendants know that their trademark infringement claims are entirely bogus and pretextual. These Defendants know that even a completely meritless trademark infringement allegation will result in Amazon doing exactly what it did, freeze Plaintiffs' store and refuse to ship inventory to customers.

79.     Gehart has proximately suffered damages as a result of Defendants' breach of the agreement in an amount excess of $75,000, including but not limited to damages directly relating to the sales, profits, and potential earnings related to his Amazon store, and the commissions and bonuses arising out of the ViSalus Compensation Plan from his own high volume purchases and the high volume purchases of the distributors in his downline organization.

## COUNT TWO
## CIVIL CONSPIRACY

80.     Plaintiff repeats and re-allege every allegation above as if set forth herein in full.

81.     The elements of a common law cause of action for civil conspiracy are: (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose or a lawful purpose by criminal or unlawful means, (4) causing damage to the Plaintiff.

82.     Defendants ViSalus, Sarnicola, AB25, Power Couple, and Mallen planned, agreed, and arranged to use Gehart, Gehart's high volume product purchases, Gehart's Avatar customers, and Gehart's amazon sales to accomplish a façade of legitimacy to their illegal pyramid scheme by using Gehart's sales and customer numbers to bolster its numbers to the public and potential recruits.

83.     The coconspirators shared in the general conspiratorial objective to use Gehart's sales and customer numbers to promote ViSalus as a legitimate company and fraudulently induce others to join the scheme.

34

84.     ViSalus, Sarnicola, and Mallen have known about, permitted, and encouraged Gehart to purchase ViSalus product in bulk and sell it on Amazon in in furtherance of the conspiracy of bolstering its numbers to the public and potential recruits.

85.     Plaintiff has suffered a loss of money proximately caused by the actions described in this Count.

## COUNTS THREE AND FOUR
## VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(c) AND 1962 (d) AGAINST
## ALL DEFENDANTS

86.     Plaintiff incorporates the facts and allegations contained in the previous paragraphs as if fully restated herein.

87.     RICO prohibits the following conduct:

It shall be unlawful for [1] any person [2] employed by or associated with [3] any enterprise [4] engaged in, or the activities of which affect, interstate or foreign commerce, [5] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs [6] through a pattern of racketeering activity or collection of unlawful debt. 18. U.S.C. § 1961-68 (numbering added to text of statute)

88.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate

35

. . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

89.     Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection … (c) of this section."

90.     RICO requires that a "person" violate its provisions." 18 U.S.C. § 1962(c-d). A RICO "person" includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A RICO person can be either an individual or a corporate entity. Defendants are each RICO persons. Each of them are employed by or associated with the enterprise.

91.     Defendants and others not named as defendants in this Complaint have for years acted as an "association-in-fact" for a common purpose. They have and maintained relationships between and among each other (and nonparties). The association-in-fact has a longevity sufficient to permit those associates to pursue the enterprise's purpose - - the establishment and perpetuation of an unlawful pyramid scheme and the operation of a fraudulent pyramid scheme. That scheme is described in the *Kerrigan et al. v. ViSalus* litigation currently pending. All factual allegations

36

describing the scope, identity of participants, creation, and goals of the scheme described in *Kerrigan*, are incorporated herein.

92.     The five Defendants named in this Complaint, and the basis for Section 1962(c) liability against them arising from their actions, is as follows. These Defendants, working in concert with others not named in this Complaint, are themselves an enterprise distinct from the corporate entity. That enterprise consisted of Sarnicola, operating his two companies AB25 and Power Couple, manipulating and directing Plaintiff's actions and the actions of the other distributors who sold product on Amazon, in concert with and understanding of Mallen. Mallen, in turn, directed Justin Call, an employee of ViSalus, and Le Gall, another employee of Le Gall, to set up and run the Amazon wholesale sales program. That program benefitted ViSalus and also benefitted the enterprise, as Mallen and Sarnicola's interests were different from the company's interests. ViSalus is distinct from the RICO enterprise because it is functionally separate, performs different roles within the enterprise and uses its separate legal incorporation to facilitate racketeering activity. AB25 and Power Couple entered into a variety of agreements with various distributors. Sarnicola, for the relevant time, was held out as the top promoter, and was in fact not an employee of ViSalus.

93.     One of the purposes of this illegal scheme was to create and foster a belief in distributors like Plaintiff that there was a large retail market for the product when in fact there was little to none. If a distributor believed there was a viable retail distribution business, he or she would, and hundreds of thousands did, invest money into the promoter fee and inventory.  Defendants permitted and encouraged sales of $4 million a month through Amazon while telling distributors that such sales were not allowed. The continued influx of promoters resulted in benefits to the enterprise separate from the company, as Mallen and Sarnicola had a stock sale agreement with Blyth that depended on favorable earnings for the company, and Sarnicola, through AB25 and Power Couple, stood to and did gain large amounts of moneys from the placement of unreal customers in his "downline."

94.     Another purpose was to aid in the running of the pyramid scheme. Mallen and Sarnicola, through ViSalus and AB25 and Power Couple, encouraged Plaintiff and the other distributors as both a hedge against potential claims by regulators and the claims by the *Kerrigan* distributors of ViSalus running a pyramid scheme (especially since the bulk of the Amazon sales and resulting artificial customer claims were done after the *Kerrigan* case was filed in July, 2014).

38

95.     The final purpose of the scheme was to induce Plaintiff and later several other distributors, to set up businesses that Defendants knew they would take over if they became useful to the Defendants. As described above, for as long as it suited their purpose, between 2012 and 2017, Defendants encouraged Gehart and other promoters to (1) operate multiple distributor positions within the compensation system, (2) to sell product below the "retail" price, undermining the ability of hundreds of thousands of distributors to sell and make a profit on ViSalus products, and (3) to input "fake" customers into the ViSalus database.

96.     A RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(5). The enterprise itself is not the liable entity, rather it is the RICO person who conducts the affairs of the enterprise through a pattern of racketeering activity.

97.     Each of the Defendants conducted, or participated directly or indirectly, in the conduct of such enterprise's affairs. ViSalus, through its Compliance Department and employees, Sarnicola (through AB25 and Power Couple) and Mallen, each controlled and approved ViSalus's business operation to accomplish the illegal scheme. ViSalus, Sarnicola, Power Couple, AB25 and

Mallen, as described in this complaint are each distinct from each other. The individual Defendants are distinct from the corporate defendant.

98.    Each of the Defendants named in this Count engaged in, and/or activities affect, interstate or foreign commerce. The pyramid scheme has operated in the United States and Canada and in recent years in Germany.

99.    RICO requires a "pattern of racketeering activity." A "pattern of racketeering activity" is one that is performed by at least two acts of racketeering activity, or violations of a "predicate" offense. A "pattern of racketeering activity" can be a past conduct that by its nature projects into the future with a threat of repetition.  It can also be conduct over a closed period through a series of related predicates extending over a substantial period.  Both of these apply here.

100.   The Defendants' pattern of racketeering activity has continued from 2011 to the present and intends to continue into the future. ViSalus intends to continue operating as an MLM company while at the same time silently undercutting its distributors through a retail channel and taking over lucrative businesses developed by plaintiff and the other ousted distributors.

101.   Mail and wire fraud are enumerated predicate acts that can constitute

RICO "racketeering activity" under Section 1961(1)(D).


102.   Mail fraud occurs when an individual devises a plot to defraud and

subsequently uses the mail in furtherance of it. 18 U.S.C. § 1341. The Defendants

named in this Count have transmitted, caused to be transmitted or invited others to

transmit material, by mail.


103.   Wire fraud occurs when an individual devises a plot to defraud and

subsequently uses wire means in furtherance of it. 18 U.S.C. § 1343. The defendants

have used the telephone and Internet since at least 2008 to disseminate, publish and

spread the scheme throughout the United States.


104.   Each Defendant committed at least two predicate acts of mail and/or

wire fraud relevant to this Count.

41

**ViSalus:**

| Mail/Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| M/W | Plaintiff and other Distributors | ViSalus Compensation Plan | 2010-current | 25, 29 | Promotional material aimed at emphasizing financial rewards from participating in opportunity |
| W | Plaintiff | Emails between Justin Call and Mike Gehart | 2012-current (5/15/12) | 48; 52 | High volume orders; Amazon selling; Amazon customers in the database, lower price offer |
| W | Plaintiff | Email from Eileen Le Gall to Mike Gehart | 9/14/12 | 50 | Assisting with canceling autoship on Avatar accounts |
| W | Plaintiff | Emails between Eileen Le Gall and Mike Gehart | 5/16/12; 9/16/12 | 48; 52 | High volume orders; Amazon selling; Amazon customers in the database |
| W | Plaintiff | Email from Vi Compliance to Gehart's Amazon account | 6/23/16 | 64 | Pricing discount |

**N. Sarnicola:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Plaintiff and other Distributors | Emails between Sarnicola and Mike Gehart | 2010-current (6/15/10) | 18 | Commission Advance Agreement; incentive bonuses; |
| W | Plaintiff | Email between Mike Gehart and Sarnicola | 10/29/12 | 52, 53, 54 | Three for Free product through Avatar customers |
| W | Plaintiff | Text messages between Sarnicola and Mike Gehart | 2012-current | 18, 37 | Selling on Amazon; Rebates and incentives |

43

**Power Couple:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Plaintiff | Emails between Sarnicola and Mike Gehart | 2015 (6/5/15; 6/8/15; 6/29/15) | 61 | Incentives for building German market |
| W | Plaintiff | Emails between Sarnicola and Mike Gehart | 2015 (3/4/15; 5/4/15) | 61 | Top Up Agreement |

**AB25:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Plaintiff | Emails between Sarnicola and Mike Gehart | 6/25/10 | 18 | Commission Advance Agreement |

| W | Plaintiff | Emails between Nick Sarnicola and Mike Gehart | 1/30/15 | 61 | Funding and reimbursements |
|---|---|---|---|---|---|

## B. Mallen:

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | Where Cited In Comp. ¶ | General Content |
|---|---|---|---|---|---|
| W | Plaintiff and other Distributors | Email between Mallen and VI Distributor | 11/1/16 | 53, 54, 56 | Product sales and customers from Amazon business |
| W | Plaintiff and other Distributors | http://blakemallen.com/ | 2011-current | 31, 32 | Predicted exponential growth for ViSalus |
| W | Plaintiff | Email from Vi Compliance to Gehart's Amazon account | 6/23/16 | 64 | Pricing discount |

| W | Plaintiff | Telephone calls and emails between Justin Call and Mallen | July 2016 | 38, 46, 51 | 50% Bonus Volume approval for product purchases; product discount pricing |
|---|---|---|---|---|---|

105.    In all respects, these Defendants have conducted their affairs unlawfully, intentionally, willfully and with intent to defraud, that is, knowingly and with such specific intent to deceive as is in violation of the mail and wire fraud statutes. They have done so in order to cause financial gain for themselves and the enterprise.

106.    Each Defendant has promoted the pyramid scheme that, by its very nature, is a *per se* scheme and artifice to defraud to obtain money by false pretenses.

107.    Each Defendant conspired and agreed with each other as described above. These agreements confer liability under Section 1962(d).

108.    Sections 1964 (c) and (d) authorize persons "injured" in their "business or property," "by reason of" RICO's "violation" to sue for appropriate redress, including equity relief, treble damages and attorneys' fees.

109.   Plaintiff has been injured in his business. He spent years developing a profitable business selling through Amazon. It was the object and goal of the enterprise to have Plaintiff and the other distributors build viable retail businesses which Defendants then would take over. Plaintiff has suffered a loss of money proximately caused by the actions described in this Count.

## COUNT FIVE
## DEFENDANTS VISALUS, SARNICOLA, AND MALLEN
## HAVE ENGAGED IN COMMON LAW FRAUD

110.   Plaintiff incorporates the facts and allegations contained in the previous paragraphs as if fully restated herein.

111.   Defendants ViSalus, Sarnicola, and Mallen have each made the material representation to Plaintiff that ViSalus was operating as a legitimate MLM company. ViSalus, Sarnicola, and Mallen each promoted ViSalus as a legitimate MLM company in order to induce Plaintiff to join ViSalus as distributor. After he joined, each of them made statements and representations that induced a belief in Plaintiff that the Amazon business was approved and a legitimate part of the MLM business. Each of them made representations or omissions that ViSalus waived or would not in the future seek to change its alleged procedures such as to take over Plaintiff's business.

47

112.   Plaintiff joined ViSalus as a distributor in reliance on representations that ViSalus was operating as a legitimate MLM company. Plaintiff invested years of time and effort to build a valuable business in the belief induced by Defendants' statements and omissions that the sales on Amazon were a legal part of a legal MLM business. Plaintiff relied on statements and omissions made by these Defendants that they would not themselves take over the Amazon business, thereby displacing and ruining Plaintiff's business.

113.   Plaintiff has suffered a loss of money proximately caused by the actions described in this Count.

## COUNT SIX
## TORTIOUS INTERFERENCE WITH A BUSINESS
## RELATIONSHIP/EXPECTANCY

114.   Plaintiff incorporates the facts and allegations contained in the previous paragraphs as if fully restated herein.

115.   Plaintiff had an existing contractual business relationship with Amazon as a FBA Seller, selling ViSalus products through his Amazon store, Healthy Store.   Plaintiff also had an expectation of a future business through

48

Amazon, as he had fulfilled all of Amazon's terms as a seller and had built up a very favorable customer rating. Plaintiff shipped ViSalus products to Amazon's fulfillment center and paid a fee to Amazon for Amazon to pack, ship, and provide customer service to Healthy Store's customers.

116.   Plaintiff has been selling ViSalus products through his Amazon store since 2012 and expected to continue selling ViSalus products through his Amazon store.

117.   Defendants ViSalus, Sarnicola, and Mallen knew that Plaintiff was selling ViSalus product through his Amazon store.

118.   Defendants ViSalus, Sarnicola, and Mallen intentionally, wrongfully and deliberately, filed a false claim with Amazon in order to disrupt and terminate Plaintiff's business relationship and business expectancy with Amazon. Plaintiff's resale of inventory he purchased is not a trademark violation, for among other reasons, the rights afforded under the first sale doctrine. Plaintiff's inventory and sales have never differed from that which he purchased, as Defendants know and knew at the time they caused the false claim to be made. Defendants' actions were

not made in good faith, rather were intended to bludgeon Plaintiff into loss of his store and reputation.

119.   Defendants' actions were wrong for the separate reason that they are attempting to enforce illegal and unenforceable resale price maintenance obligations on Plaintiff. Defendants know that the requirement that distributors must sell on Amazon only at a false "retail" price is illegal and unenforceable, but have used that as a pretextual reason to prohibit Plaintiff from selling on Amazon.

120.   The actions caused Plaintiff injury. In response to the false trademark claim, Amazon removed Plaintiff's ViSalus product listings from his Amazon store, blocked Plaintiff from selling ViSalus products through his Amazon store, and returned the products stored in its fulfillment center to Plaintiff.

121.   Plaintiff has suffered a loss of money proximately caused by the Defendants' intentional and improper disruption and termination of his business relationship and expectancy as described in this Count.

## **PRAYER FOR RELIEF**

Plaintiff, Gehart, requests the following relief:

a.   Judgment against the defendants;

b.   Damages in the amount of the injury incurred to Plaintiff's business and Plaintiff as a result of Defendants' conduct;

c.   Damages for Defendants' violations of 18 U.S.C. § 1962(c) and (d) and that such sum be trebled in accordance with 18 U.S.C. § 1964(c);

d.   The costs of investigation and litigation reasonably incurred, as well as attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

e.   All other damages and relief as the Court may deem just and proper.

## **DEMAND FOR A JURY TRIAL**

Plaintiff demands a jury trial.

Filed this 29th day of June, 2017.

Respectfully submitted,

SOMMERS SCHWARTZ, P.C.

s/ Andrew Kochanowski
Andrew Kochanowski (P55117)
Sarah L. Rickard (P78767)
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
akochanowski@sommerspc.com
srickard@sommerspc.com

PREBEG, FAUCETT & ABBOTT, PLLC
Matthew J.M. Prebeg
(TX Bar No: 00791465)
Brent T. Caldwell
(TX Bar No: 24056971)
8441 Gulf Freeway, Suite 307
Houston, TX 77017
(832) 743-9260
mprebeg@pfalawfirm.com
bcaldwell@pfalawfirm.com

WEXLER WALLACE LLP
Edward A. Wallace
(IL Reg. No. 6230475)
Mark R. Miller
(IL Reg. No. 6283542)
Adam Prom
(IL Reg. No. 6317283)
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 589-6272
EAW@wexlerwallace.com
MRM@wexlerwallac.com
ap@wexlerwallace.com

52